# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CARMEN CHAMBERS,
    Plaintiff,

       vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:11-cv-453

Barrett, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB). This matter is before the Court on plaintiff's Statement of

Errors (Doc. 10), the Commissioner's response in opposition (Doc. 13), and plaintiff's reply

memorandum. (Doc. 16).

## I. Procedural Background

Plaintiff filed an application for DIB in April 2006, alleging disability since January 1,

2004, due to osteoarthritis, obesity, diverticulitis, high cholesterol, panic attacks, ulcers, and

bladder problems. Plaintiff's application was denied initially and upon reconsideration. Plaintiff

requested and was granted a *de novo* hearing before administrative law judge (ALJ) Deborah

Smith. The hearing scheduled for April 22, 2009 was commenced, but then continued to give

plaintiff time to find an attorney. A second hearing was held on September 30, 2009, at which

plaintiff, still unrepresented by counsel, and a vocational expert (VE) appeared and testified. On

October 30, 2009, the ALJ issued a decision denying plaintiff's DIB application. Plaintiff's

request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Medical Evidence[1]

The record contains treatment records from urologist Eric Kuhn, M.D., dating from June 2001 through September 2005. (Tr. 262-301). Dr. Kuhn treated plaintiff for urinary incontinence. (Tr. 261). Plaintiff underwent a TVT (Trans-Vaginal Tape) bladder neck suspension surgery in August 2001 to treat her stress incontinence. (Tr. 275-76). Follow-up treatment notes showed she continued to experience persistent detrusor instability despite anticholinergic medications; thus, while plaintiff's stress incontinence improved after surgery, she continued to experience profound urinary urgency and urge incontinence as well as bowel urgency and episodes of fecal soiling. (Tr. 263, 265, 266, 292, 294). In July 2006, Dr. Kuhn reported that plaintiff's stress urinary incontinence was resolved with the TVT treatment. Dr. Kuhn concluded that no further surgery was needed. (Tr. 260). On July 17, 2006, Dr. Kuhn reported to the state agency that plaintiff's incontinence had been treated and her stress incontinence resolved, but she continued to have problems with urge incontinence and had been treated with anticholinergic medications. An MRI scan was performed in October of 2005 which showed bilateral renal cysts. There was no evidence of obstruction or tumor. Dr. Kuhn stated that renal cysts are not symptomatic and would not be contributory to any other renal function problems. (Tr. 261).

---

[1]Plaintiff alleges no errors arising from the ALJ's evaluation of the medical evidence pertaining to any mental impairments. Accordingly, the Court has summarized herein the medical evidence relating only to plaintiff's physical impairments.

Primary care physician Robert Bennett, M.D., treated plaintiff from August 2003 through at least June 2007. (Tr. 238-49, 443-45). Dr. Bennett's treatment notes contain a June 2003 MRI study of plaintiff's cervical spine, which showed a left paracentral end plate osteophyte and disc protrusion at C4-5 that deformed the anterior aspect of the dural sac. The radiologist noted that the dural sac remained within normal AP dimension. (Tr. 248-49). The records show that plaintiff's complaints to Dr. Bennett included pain in her hand, foot, arm, leg, hip, abdomen, shoulder, and back; difficulty walking; fatigue; and incontinence. (Tr. 240-45). Dr. Bennett treated plaintiff for neck pain, hypothyroidism, osteoarthritis of both knees, planter fasciitis, and urge incontinence. Dr. Bennett's records also contain notations of fibromyalgia, obesity, carpal tunnel syndrome, rotator cuff syndrome, bipolar disorder, and degenerative joint disease of the left thumb. (Tr. 241-42, 244-45).

Tests ordered by Dr. Bennett include an abdominal and pelvic CT in August 2005 to ascertain the cause of plaintiff's abdominal and hip pain. The CT showed chronic sigmoid colon diverticular disease, an exophytic lesion in plaintiff's right kidney, a lesion in her liver, and arthritic changes at her sacroiliac joints and symphysis pubis. (Tr. 237). An abdominal MRI in October 2005 revealed four cysts in plaintiff's kidneys. (Tr. 234). An October 2005 lumbar spine MRI revealed left disc protrusions at T12-L1 and at L4-5 and facet arthropathy at L4-5. (Tr. 234-35). An MRI of plaintiff's knee was ordered in June 2007 to determine the cause of her knee pain. The MRI revealed severe chondromalacia patella, chondromalacia of the medial knee joint, and osteoarthritis. (Tr. 443-45).

Amador Delamerced, M.D., completed a Bureau of Disability Determination questionnaire on June 27, 2006, in which he opined that plaintiff suffers from diffuse pain,

fibromyalgia, muscle spasms, and trigger point pain. (Tr. 250-51). He opined that plaintiff is unable to complete fine and gross manipulations due to pain but she has normal range of motion. *Id.* Dr. Delamerced described her gait as straight and stated that she did not require a cane or ambulatory aid. Dr. Delamerced concluded that plaintiff's symptoms have persisted for over two years. *Id.*

In August 2006, plaintiff was evaluated by consultative examiner Herbert Schapera, M.D. (Tr. 317-24). Plaintiff complained of widespread musculoskeletal pain involving her arms, shoulders, knees, and hips; dyspnea on exertion; and nausea. (Tr. 317). Dr. Schapera noted that plaintiff ambulated with a normal gait without the use of ambulatory aids. (Tr. 318). She was comfortable in both the sitting and standing positions. *Id.* Plaintiff complained of constantly being in pain, particularly on the left side. *Id.* Dr. Schapera noted that plaintiff had a "ratchety giveway response," making manual muscle testing unreliable; however, her muscle strength appeared to be 5/5 ("normal") in both upper extremities and the right lower extremity, and 4/5 ("good") in the left lower extremity. *Id.* Dr. Schapera noted that plaintiff would not raise her arms above the horizontal, and any attempts at passive range of motion resulted in marked complaints of pain. *Id.* Plaintiff had normal manipulative ability and there was no evidence of muscle weakness or atrophy. (Tr. 318-19). There were no tender areas in the trunk to suggest fibromyalgia. (Tr. 319). There was no evidence of nerve root damage as all deep tendon reflexes were brisk and all sensory modalities were well-preserved. *Id.* Plaintiff had normal range of motion throughout her body. (Tr. 322-24). He diagnosed plaintiff with morbid obesity and a history of "fibromyalgia." (Tr. 319). Dr. Schapera concluded that plaintiff would be capable of performing a mild to moderate amount of sitting, ambulating, standing, bending, kneeling,

pushing, pulling, lifting and carrying heavy objects. In addition, she may have difficulty reaching overhead, but would have no difficulty grasping and handling objects. There were no visual and/or communication limitations, nor were there environmental limitations. (Tr. 320).

The record was reviewed by state agency physician, Willa Caldwell, M.D., in September 2006. (Tr. 325-32). Dr. Caldwell concluded that plaintiff could lift, carry, push and pull 50 pounds occasionally and 25 pounds frequently; sit about six hours in an eight-hour workday; and stand/walk about six hours in an eight-hour workday. (Tr. 326). Dr. Caldwell also found that plaintiff could never climb ladders, ropes, or scaffolds; frequently kneel, stoop, crouch, balance, and crawl; and frequently climb ramps and stairs. (Tr. 327). When discussing the evidence to support her conclusions, Dr. Caldwell noted that plaintiff alleged fibromyalgia and osteoarthritis and that she could not lift heavy items or stand for long periods of time. (Tr. 326). She also found that Dr. Schapera's examination findings were essentially normal. (Tr. 326-27). Dr. Caldwell further noted that while there were some signs of diverticular disease, there was no evidence or allegation of severe weight loss or malnutrition associated with severe diverticulosis. (Tr. 326). Dr. Caldwell also wrote that while plaintiff had a history of urinary incontinence, it had been resolved with medications. (Tr. 326). After reviewing the record in September 2007, state agency physician Maria Congbalay, M.D., affirmed Dr. Caldwell's assessment. (Tr. 347).

In April 2007, plaintiff began treating with urogynecologist Mickey M. Karram, M.D., due to continued complaints of urge incontinence. (Tr. 339-46). Dr. Karram documented plaintiff's complaints of severe urge urinary incontinence, vaginal discharge, odor, and pain after a sling procedure, and diagnosed her with urinary urge incontinence and fecal incontinence. (Tr. 339, 342). He noted that plaintiff had failed multiple anticholinergic medications. (Tr. 342).

5

Plaintiff was started on estrogen therapy and scheduled for multichannel urodynamic testing and a cystoscopy. (Tr. 342). Dr. Karram found that plaintiff continued to experience "fairly severe urgency and frequency with severe urge incontinence" despite trying several medications to treat those conditions. (Tr. 339).

Dr. Karram also saw plaintiff on consultation while she was hospitalized at Good Samaritan Hospital in August 2007 due to pelvic pain. Plaintiff complained of urgency and frequency. (Tr. 367-419). During this hospitalization, he diagnosed plaintiff with urgency and frequency, urinary tract infection with acute pyelonephritis, and diverticulitis (confirmed by an abdominal CT). (Tr. 343-45, 409, 413).

The record contains a questionnaire completed on August 17, 2007, by Stephen Winhusen, M.D. (Tr. 333-35). Dr. Winhusen, who examined plaintiff on one occasion, reported that plaintiff has arthritis, depression, and hypothyroidism. (Tr. 334-35). He did not know how long plaintiff had these symptoms or how they responded to treatment. (Tr. 335). He opined that plaintiff's depression is significant. In terms of plaintiff's restrictions of daily activities, Dr. Winhusen reported that plaintiff would "not be able to play physical sports." (Tr. 334-35). He also opined that plaintiff would have difficulty with repetitive movements and with lifting heavy objects. *Id.*

Plaintiff treated with Antonio Rojas, M.D., from July 2008 to March 2009 for chronic pain, hyperthyroidism, anxiety, vitamin D deficiency, and diverticulitis. (Tr. 348-66). Initially, plaintiff complained of diverticulitis and low back pain. Dr. Rojas found plaintiff had greater than twelve tender trigger points during examination. (Tr. 366). He diagnosed fibromyalgia, hyperthyroidism, and anxiety. *Id.* While treating with Dr. Rojas, plaintiff reported symptoms of

6

fatigue, anxiety, sleeplessness, shortness of breath, an inability to bend over, and chronic pain. (Tr. 359-62). A colonoscopy screening in October 2008 revealed moderate diverticulitis. (Tr. 355). Laboratory results showed low vitamin D and TSH (thyroid-stimulating hormone). (Tr. 350, 352, 354, 356-57). In February 2009, Dr. Rojas noted plaintiff was using a CPAP machine due to fatigue. (Tr. 359).

Plaintiff attended two physical therapy sessions at Mercy Franciscan Hospital in 2009. (Tr. 421-35). Physical therapy records show plaintiff reported pain in her back, arm, shoulder, neck, and left elbow; pain with all movements; and sleeplessness. (Tr. 423-24, 431). The physical therapist found that plaintiff had weak core muscles, left shoulder impingement, rotator cuff weakness, poor posture when standing and sitting, pain with movement, and tenderness to palpation with palpable knots in her right lumbar paraspinal muscles. (Tr. 425-27). Plaintiff terminated her physical therapy sessions to babysit her daughter's child. (Tr. 421).

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a)

(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the

sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir.

2004). Once the claimant establishes a prima facie case by showing an inability to perform the

relevant previous employment, the burden shifts to the Commissioner to show that the claimant

can perform other substantial gainful employment and that such employment exists in the

national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir.

1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2011.

2. The claimant has not engaged in substantial gainful activity since January 1,

8

2004, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease and obesity when considered [in] combination (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to do a range of medium work. She can occasionally lift and/or carry fifty pounds and lift and/or carry twenty five pounds frequently. She can stand and/or walk for six hours in an eight hour workday and sit for six hours in an eight hour workday. The claimant can only occasionally reach overhead with her left arm. She can never climb ladders, ropes, or scaffolds.

6. The claimant is capable of performing her past relevant work as a school crossing guard, photo printer operator, sales person, and cleaner. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2004 through the date of this decision (20 CFR 404.1520(f)).

(Tr. 17-24).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,*

478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

(1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007)). *See also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-46 (6th Cir. 2004) (reversal required even though ALJ' s decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

On appeal, plaintiff asserts three assignments of error: (1) the ALJ erred by failing to properly develop the medical record; (2) the ALJ erred in finding several of plaintiff's impairments are not severe and by failing to account for both the severe and nonsevere impairments in the RFC; and (3) the ALJ placed undue emphasis on plaintiff's daily activities when she analyzed plaintiff's credibility.

**1. The ALJ did not err in developing the medical record.**

Plaintiff contends the ALJ erred by failing to properly develop the medical record in light of plaintiff's pro se status at the ALJ hearing. Plaintiff argues that the ALJ failed to obtain records from treating physician Dr. Delamerced, who completed a questionnaire in June 2006 in which he reported that he began treating plaintiff in March 2006, but whose treatment records are not contained in the file. In addition, plaintiff contends that it was ALJ Smith's duty to obtain the records of another treating physician, Dr. Winhusen, which are not a part of the file, particularly because plaintiff did not have the assistance of counsel at the hearing. Plaintiff also asserts that the ALJ failed to obtain Good Samaritan Hospital Clinic records in addition to the test results, emergency department notes, hospital admissions, and "Patient Abstracts" that the hospital submitted. Plaintiff argues the Patient Abstracts put the ALJ on notice that additional record evidence of progress notes and/or office visits existed, which the ALJ should have requested.

The Commissioner contends that the ALJ adequately developed the record because she in fact solicited records from Dr. Delamerced (Tr. 250) and Dr. Winhusen (Tr. 333).[2] The Commissioner asserts that because Dr. Delamerced saw plaintiff over only a three-month period and Dr. Winhusen saw plaintiff on only one date, the ALJ could reasonably conclude that the doctors turned over all the pertinent records even though they only answered the questionnaire attached to the request for records. The Commissioner also argues that in addition to the Good Samaritan Patient Abstracts, the record contains diagnostic test results, operative reports,

_____

[2]The request for information actually came from the state agency (DDS) to each physician and states: "Please submit a medical report or copies from existing office records to include: * History * Objective findings to include the most recent physical/mental status exam and clinical/lab tests * Diagnosis/Prognosis/Treatment/Response to Treatment * Work-related functional limitations. . . ." (Tr. 250, 333).

consultation reports and laboratory results, and there is no evidence that any other records are missing. The Commissioner also contends that plaintiff has failed to obtain any of the allegedly missing records subsequent to the ALJ hearing showing the ALJ committed harmful or reversible error.

"Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000). While the claimant carries the burden of establishing disability, *see* 20 C.F.R. § 404.1512(a), the ALJ has a heightened duty to develop the administrative record "when a claimant is without counsel, is not capable of presenting an effective case, and is unfamiliar with hearing procedures. . . ." *Trandafir v. Commissioner of Social Sec.*, 58 F. App'x 113, 115 (6th Cir. 2003) (citing *Duncan v. Sec'y of H.H.S.*, 801 F.2d 847, 856 (6th Cir. 1986); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983)). The ALJ must elicit all relevant facts on both sides of the issue in order to fully develop the record. *Lashley*, 708 F.2d at 1051-52 (6th Cir. 1983). This Court must analyze the record to determine whether the ALJ failed to fully develop the record and therefore denied plaintiff a full and fair hearing. *See Duncan*, 801 F.2d at 856.

The Court has carefully reviewed the administrative hearing transcript and record in this case and finds the ALJ did not err in her duty to fully develop the record. This case is factually distinct from *Lashley*. The Sixth Circuit in *Lashley* determined the ALJ erred in his duty to develop the record in the case of a 79 year-old pro se claimant who had a fifth grade education, had suffered two strokes, and had trouble reading, writing, and reasoning. *Id.* at 1049. The ALJ conducted a superficial examination that lasted only 25 minutes and failed to pay attention to the

12

claimant's obvious confusion and inability to effectively present his case at the hearing. *Id.* at 1052. Unlike the claimant in *Lashley,* who was inarticulate and displayed limited intelligence at the hearing, there is no evidence in the instant case that plaintiff's education (some college) or impairments prevented her from understanding the administrative proceedings, answering the ALJ's questions in a cogent manner, or presenting her case. The ALJ continued the first administrative hearing to allow plaintiff an opportunity to obtain counsel, provided plaintiff with information about obtaining counsel, and advised plaintiff that if she appeared at the second hearing without counsel the hearing would proceed absent a good excuse. (Tr. 28, 36). When plaintiff had not secured counsel by the second hearing, the ALJ proceeded with the hearing.

At the first hearing, the ALJ questioned plaintiff about her medical treatment and providers so that the ALJ could obtain the necessary medical records. (Tr. 29-36). The ALJ spoke with plaintiff about the records from Dr. Delamerced and Dr. Winhusen, and plaintiff confirmed she had not seen Dr. Delamerced after 2006 and had not seen Dr. Winhusen after the single time he examined her in August 2007. (Tr. 31). The ALJ also confirmed she would obtain the records from Good Samaritan Hospital (Tr. 32-34), as well as the records from the medical providers plaintiff saw after Dr. Winhusen. The ALJ requested and obtained those records.

Both Drs. Delamerced and Winhusen responded to the state agency's request for records by completing the Department of Disability Services' questionnaire which asked for specific information about plaintiff's impairments and limitations. While neither physician supplied clinic notes or other medical records in addition to the questionnaire, it was reasonable for the ALJ to conclude that both Drs. Delamerced and Winhusen provided all pertinent information

available to them or in their possession in response to the request for information. In addition, plaintiff has not provided, nor has the Court found, any legal authority requiring an ALJ to request additional records when a physician responds to a request for information by completing a questionnaire as in the instant case. When requesting the Good Samaritan Hospital records, the ALJ asked for "All records from 2007 to present: ER visits, tests, hospital admissions." (Tr. 213). In response, Good Samaritan provided Patient Abstracts, diagnostic test results, operative reports, consultation reports, and laboratory results. (Tr. 233-237, 275-276, 343-345, 346, 368-375, 378-382, 385-413, 417-419). While plaintiff alleges the Patient Abstracts alerted the ALJ to the existence of other records, plaintiff has made no showing that such records actually exist, despite having obtained counsel prior to her appeal to the Appeals Council. (Tr. 226-231). Plaintiff has had ample time to obtain such records and show that such records would have changed the outcome in this case. *See Harrison on Behalf of Harrison v. Sec'y of HHS*, No. 86-1089, 1986 WL 18491, at *4 (6th Cir. Dec. 4, 1986) (no failure to develop record where plaintiff did not show records even existed and plaintiff retained counsel between ALJ hearing decision and request for Appeals Council review, but counsel did not submit allegedly missing medical evidence); *Allison v. Sec'y of HHS*, No. 84-5281, 1985 WL 13097, at *2 (6th Cir. March 21, 1985) (no failure to develop record where plaintiff never sought to reopen claim on basis of new evidence or present medical reports which were available but were not part of the record). *See also Brock v. Chater*, 84 F.3d 726, 728-729 (5th Cir. 1996) ("Brock points to no evidence that, had the ALJ developed the record further, would have been adduced at the hearing and would have changed the result. We will not reverse the decision of an ALJ for lack of substantial

14

evidence where the claimant makes no showing that he was prejudiced in any way by the deficiencies he alleges.").

"While this Court will 'scrutinize the record with care' where the claimant is unrepresented . . . our scrutiny does not require reversal merely because the record may not be as developed as it would otherwise be because the claimant proceeded pro se." *Rowden v. Chater*, No. 95-5630, 1996 WL 294464, at *1 (6th Cir. June 3, 1996). The ALJ made reasonable efforts here to obtain plaintiff's medical records. Plaintiff has not shown she suffered any prejudice as a result of the ALJ's failure to request additional records. Therefore, her first assignment of error should be overruled.

### 2. The ALJ's severity finding is supported by substantial evidence.

A severe impairment or combination of impairments is one that significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. §404.1520(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. §404.1521(b). Plaintiff is not required to establish total disability at this level of the sequential evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Secretary of H.H.S.*, 736 F.2d 352, 357 (6th Cir. 1984). An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985) (citing *Brady v.*

*Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). The severity requirement is a "*de minimus* hurdle" in the sequential evaluation process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). *See also Rogers v. Commissioner*, 486 F.3d 234, 243 n.2 (6th Cir. 2007).

Plaintiff argues that the ALJ erred by not finding that plaintiff's urge incontinence, internal derangement and arthritis of the left knee, left shoulder impingement syndrome and rotator cuff damage, fibromyalgia, and diverticulitis are severe impairments. Plaintiff also contends that the ALJ failed to account for both the severe and non-severe impairments in the residual functional capacity assessment. For the reasons that follow, the Court finds the ALJ's severity findings are supported by substantial evidence.

Plaintiff contends that the ALJ's finding of non-severe urge incontinence is not supported by substantial evidence and that the ALJ failed to appreciate the difference between plaintiff's "stress" incontinence and "urge" incontinence. Contrary to plaintiff's argument, the ALJ addressed both the stress and urge incontinence separately in her decision, demonstrating she recognized the difference. (Tr. 18). Dr. Kuhn reported that as of September 2005,[3] the date he last examined plaintiff, plaintiff's stress incontinence had resolved with surgery, but that she "has had issues with urge incontinence and has been treated with anticholinergic medications." (Tr. 261). Dr. Kuhn did not opine that plaintiff's urge incontinence limited her ability to work. Notably, Dr. Kuhn reported that plaintiff was compliant with her medications and that her symptoms responded to treatment. (Tr. 260). The ALJ reasonably noted that plaintiff had been treated with several different medications for her urge incontinence, yet plaintiff's reports about

---

[3]While Dr. Kuhn's report is dated July 17, 2006, he states that he last examined plaintiff on September 30, 2005. (Tr. 259).

the effectiveness of the medications was inconsistent. (Tr. 18, citing Tr. 244 [reports no benefit with Detrol]; Tr. 263 [same]; Tr. 265 [urge incontinence responding favorably to anticholinergics]; Tr. 266 [has used Detrol in past with good results, but for cost reasons using Ditropan with sub-optimal results]; Tr. 294 [feels Detrol has been helpful]). Following treatment with Dr. Kuhn, plaintiff did not receive treatment for urge incontinence for nearly two years until she began treatment with Dr. Karram in April 2007. (Tr. 339-46). Dr. Karram treated plaintiff for five months until August 2007. (Tr. 367-419). The ALJ noted that while plaintiff testified at the September 2009 hearing she needed to use the bathroom 20 times per day, the medical records show no treatment for or complaints of urge incontinence after August 2007, a period of more than two years. (Tr. 18). In light of the evidence of significant gaps in treatment for urge incontinence and the absence of any evidence that any medical source placed limitations on plaintiff as a result of this condition, the ALJ reasonably determined that plaintiff's urge incontinence did not limit her ability to perform basic work activities.

The ALJ also reasonably determined that plaintiff's left knee and shoulder impairments are not severe. The findings cited by plaintiff in support of her argument that her left knee and shoulder impairments are severe are minimal and do not show a persistent problem over the relevant time period. Plaintiff cites to only three records in support of a severe knee impairment (Doc. 10 at 14): a 2007 MRI showing severe chondromalacia of the patella (Tr. 443), reduced knee flexion in August 2006 and January 2009 (Tr. 321, 324, 426), and atrophy of the thigh and calf. (Tr. 322, August 2006). Yet, the findings from the August 2006 report of Dr. Schapera cited by plaintiff also indicate that manual muscle testing was unreliable given plaintiff's "ratchety giveway response" and that despite the reduced flexion and atrophy findings, plaintiff

17

ambulated with a normal gait and was able to perform a mild to moderate amount of standing, walking, kneeling, and lifting and carrying of heavy objects. (Tr. 319, 320). The 2007 MRI cited by plaintiff also shows only mild chondromalacia of the medial knee joint and mild osteoarthritis (Tr. 443), and plaintiff cites to no evidence that any physician limited plaintiff in any way based on the MRI findings or that plaintiff received any treatment for knee pain other than physical therapy in 2009. Notably, the January 2009 physical therapy report shows that knee flexion was rated as 4/5, which was "good." (Tr. 426; see Tr. 321 rating 4/5 as "good"). The ALJ reasonably determined that based on the minimal findings of record, plaintiff's knee impairment is not severe.

Plaintiff's evidence of a severe shoulder impairment is even more sparse. (Doc. 10 at 14, citing Tr. 241, 425). On one occasion in March 2006, progress notes show tenderness to palpation of plaintiff's left medial scapular border and left posterior lateral rib cage (Tr. 241),[4] and on one occasion in January 2009 a physical therapist[5] noted that plaintiff "has symptoms consistent with weak core mm and left shoulder impingement, left RTC [rotator cuff] weakness." (Tr. 425). These minimal findings, some three years apart, do not establish plaintiff has a severe shoulder impairment for the relevant time period, and plaintiff has cited to no evidence showing

---

[4]This note also shows plaintiff "refused" physical therapy, stating it "makes it worse." (Tr. 241).

[5]A physical therapist is not an acceptable medical source under the Social Security regulations. Compare 20 C.F.R. § 404.1513(a) (acceptable medical sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists and qualified speech-language pathologists), with 20 C.F.R. § 404.1513(d)(1) (medical sources not listed in § 404.1513(a), such as nurse practitioners, physicians' assistants, and therapists are considered to be "other sources" rather than "acceptable medical sources"). See also Nierzwick v. Comm'r of Soc. Sec., 7 F. App'x 358, 363 (6th Cir. 2001) (physical therapist's report not afforded significant weight because therapist not recognized as an acceptable medical source). Because physical therapists are not considered acceptable medical sources under the regulations, the ALJ was not required to give any special deference to the therapist's findings.

any acceptable medical source has imposed any limitations on plaintiff based on the alleged shoulder impairment.

Next, plaintiff argues the ALJ erred by failing to recognize her fibromyalgia as a severe impairment. Fibromyalgia is a condition that "causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances." *Preston v. Sec. of HHS*, 854 F.2d 815, 817-820 (6th Cir. 1988). In the context of social security disability cases, fibromyalgia presents particularly challenging issues in determining credibility, RFC, and disability because its symptoms are entirely subjective. *See Rogers v. Commissioner*, 486 F.3d 234, 243 n. 3 (6th Cir. 2007). Unlike other medical conditions, fibromyalgia is not amenable to objective diagnosis, and standard clinical tests are "not highly relevant" in diagnosing or assessing fibromyalgia or its severity. *Preston*, 854 F.2d at 820. *See also Rogers*, 486 F.3d at 243-44 ("in light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant"). Individuals suffering from fibromyalgia "manifest normal muscle strength and neurological reactions and have a full range of motion." *Rogers,* 486 F.3d at 244 (quoting *Preston,* 854 F.2d at 820). A diagnosis of fibromyalgia involves testing a series of focal points for tenderness and ruling out other possible conditions through objective medical and clinical trials. *See Rogers*, 486 F.3d at 244.

In this case, the ALJ noted the record contains conflicting evidence regarding fibromyalgia. (Tr. 18). Dr. Bennet reported complaints of pain and tenderness (Tr. 239-40); Dr. Delamerced reported "diffuse tender trigger points" due to fibromyalgia (Tr. 251); and Dr. Rojas reported ">12 tender points c/w [consistent with] fibromyalgia." along with complaints of chronic back pain. (Tr. 366). In contrast, Dr. Schapera noted no tender areas in the trunk to

suggest fibromyalgia on consultative examination. (Tr. 319). In addition, the ALJ noted that plaintiff did not see a rheumatologist, the appropriate specialist for fibromyalgia[6], and there was other medical evidence to suggest other possible causes for plaintiff's pain, such as degenerative disc disease which the ALJ determined to be a severe impairment. (Tr. 17, 18).

Although two physicians diagnosed fibromyalgia, the ALJ was not required to find based on the totality of the medical evidence of record that plaintiff suffered from this impairment or that it significantly limited her physical ability to perform basic work activities. As set forth above, the ALJ here relied on several factors, in addition to a lack of objective findings (Tr. 18), to determine that plaintiff's severe impairments do not include fibromyalgia. The Court recognizes that is the province of the ALJ to resolve conflicts in the medical evidence, *see Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 803 (6th Cir. 2008), and the ALJ here was faced with conflicting evidence as to whether plaintiff's symptoms could be attributable to fibromyalgia or another cause, such as her degenerative disc disease. As the ALJ's resolution of this conflict is supported by substantial evidence, it should be upheld.

Plaintiff argues that her "abdominal pain and intermittent infections from her diverticulitis reasonably can be expected to interfere with plaintiff's ability to maintain competitive standards of attendance and punctuality" (Doc. 10 at 15), but she provides no evidence to support these limitations. While plaintiff has been diagnosed with diverticulitis, as confirmed by CT scans in 2005 and 2007 (Tr. 234, 418, 413), and moderate diverticulosis, as shown by an October 2008 colonoscopy (Tr. 355), the mere diagnosis of an impairment, in itself,

---

[6]*Benecke v. Barnhart*, 379 F.3d 587, 594 n.4 (9th Cir. 2004) ("Rheumatology is the relevant specialty for fibromyalgia."); *Sarchett*, 78 F.3d at 307 ("Fibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist.").

is not conclusive evidence of disability because it does not reflect the limitations, if any, that it may impose upon an individual. *See Stevens v. Astrue,* 839 F. Supp.2d 939, 949-50 (S.D. Ohio 2012) (citing 20 C.F.R. § 404.1512(a); *Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988)). During her alleged period of disability, plaintiff was treated only once, in August 2007, for a possible flare-up of diverticulitis when she went to the emergency room and was admitted for two days for flank pain and "pyelonephritis (kidney infection) versus diverticulitis." (Tr. 408). Plaintiff was diagnosed with a urinary tract infection with acute pyelonephritis and treated with medication. Her symptoms resolved, and the management of her diverticulitis was deferred to her primary care physician. (Tr. 409). In addition, Dr. Caldwell acknowledged plaintiff had been diagnosed with diverticulitis but noted there was no evidence or allegation of severe weight loss or malnutrition associated with severe diverticulitis. (Tr. 326). There is no evidence showing plaintiff's diverticulitis significantly limits her ability to perform basic work activities and no physician reported that plaintiff's diverticulitis affected her ability to function or resulted in any work limitations. Accordingly, there is no basis for the ALJ to find that diverticulitis was a severe impairment.

Finally, the ALJ properly considered plaintiff's severe and non-severe impairments in assessing plaintiff's RFC. Under the Social Security Regulations, once the ALJ determines a claimant has at least one severe impairment, the ALJ must consider all impairments, severe and non-severe, in the remaining steps of the sequential evaluation process. 20 C.F.R. § 404.1545(e). If an ALJ considers all of a claimant's impairments (both severe and non-severe) in determining the claimant's RFC, the ALJ's failure to characterize additional impairments as "severe" is not reversible error. *See Maziarz v. Sec. of HHS,* 837 F.2d 240, 244 (6th Cir. 1987)).

Here, the ALJ determined that plaintiff's degenerative disc disease and obesity were severe impairments and continued the sequential evaluation process until she determined that plaintiff could perform her past relevant work and was not disabled at Step Four of the analysis. In assessing plaintiff's RFC, the ALJ considered all of plaintiff's complaints and symptoms, as well as plaintiff's reported limitations on lifting, walking, bending, standing, sitting and using her hands, among others. The ALJ also considered plaintiff's allegations of severe leg, back and neck pain, all of which she attributed to her severe and non-severe impairments. (Tr. 21-22). For example, the ALJ considered plaintiff's history of fibromyalgia, but explained that plaintiff's professed resulting limitations were not supported. (Tr. 22). The ALJ also considered plaintiff's inconsistent treatment history and refusal to take narcotic pain medication, both of which were inconsistent with her allegations of disabling pain from all her impairments. The fact that the ALJ failed to included any specific limitations in the RFC related to any particular non-severe impairment does not constitute reversible error. None of plaintiff's doctors opined that plaintiff's fibromyalgia, arm and knee impairments, diverticulitis, or urge incontinence limit plaintiff to an extent beyond that recognized by the ALJ. Given the ALJ's finding of severe impairments at Step Two and consideration of all symptoms and evidence when determining plaintiff's RFC, the Court finds no reversible error.

### 3. The ALJ's credibility finding is supported by substantial evidence.

In her third assignment of error, plaintiff asserts the ALJ placed undue emphasis on plaintiff's daily activities[7] when assessing her credibility and that the reasons given by the ALJ

---

[7]Plaintiff couches this assignment of error in terms of her "daily activities," but the only argument plaintiff provides in support of the "daily activity" assignment of error relates to plaintiff's babysitting. (Doc. 10 at 19-20). In her reply brief, plaintiff also argues she must take breaks when performing household chores or running errands. (Doc. 16 at 10). However, plaintiff did not raise this issue in her Statement of Errors and may not raise new issues

for discounting plaintiff's credibility do not withstand scrutiny. (Doc. 10 at 17, 18). Specifically, plaintiff contends the ALJ erred by relying on Dr. Schapera's report, plaintiff's early termination of physical therapy, her refusal to take narcotic pain medication, her employment history, and her babysitting activities in assessing her credibility.

In light of the ALJ's opportunity to observe the individual's demeanor at the hearing, the ALJ's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk v. Sec. of H.H.S.,* 667 F.2d 524, 538 (6th Cir. 1981). "If an ALJ rejects a claimant's testimony as incredible, [she] must clearly state [her] reasons for doing so." *Felisky,* 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.,* 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker,* 732 F.2d 75, 78 (7th Cir. 1984)).

Social Security Regulation 96-7p, 1996 WL 374186, at *2 (July 2, 1996), describes the requirements by which the ALJ must abide in rendering a credibility determination:

> It is not sufficient for the adjudicator to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

---

for the first time in her reply brief. *See Wright v. Holbrook,* 794 F.2d 1152, 1156 (6th Cir. 1986). *See also Bishop v. Oakstone Academy,* 477 F. Supp.2d 876, 889 (S.D. Ohio 2007) ("[I]t is well established that a moving party may not raise new issues for the first time in its reply brief"). Accordingly, this Report and Recommendation will only address plaintiff's daily activities in terms of her babysitting activity.

Here, plaintiff has failed to show that the ALJ's credibility finding should be disturbed. First, the ALJ did not err by relying on Dr. Schapera's report in determining that plaintiff's functional abilities were greater than those stated by plaintiff. The ALJ noted that on "consultative examination with Dr. Schapera, the claimant's muscle strength was well-preserved, her manipulative ability was normal, there was no muscle atrophy or spasm, and the neurological exam was normal." (Tr. 23, 317-324). Plaintiff argues that Dr. Schapera actually found muscle weakness of plaintiff's left hip, knee, foot, and great toe flexor and extensor along with muscle atrophy of plaintiff's left thigh and calf, which support a finding of radiculopathy and corresponds to plaintiff's complaints of shooting pain in her left leg.[8] (Doc. 16 at 8, citing Tr. 321, 323-24). Yet, Dr. Schapera also reported that he considered the muscle testing unreliable as plaintiff displayed "fluctuating, ratchet like" responses to the testing and he concluded "muscle strength appears to be 5/5 throughout in both upper and lower extremities" and that there was no evidence of muscle atrophy. (Tr. 318, 321). While plaintiff posits an alternative explanation for plaintiff's alleged lack of effort, *i.e.*, pain (Doc. 16 at 9 n.5), the ALJ reasonably relied on the conclusions reached by the physician who actually examined and performed testing on plaintiff in assessing plaintiff's credibility.

Second, plaintiff alleges the ALJ's reliance on plaintiff's termination of physical therapy after one session is not supported because plaintiff testified she could not afford to continue physical therapy and the records show she had to cancel some of her appointments because of illness and snowy weather. (Doc. 16, citing Tr. 34, 58, 422-24). Yet, close review of the

---

[8]Plaintiff cites to no medical evidence in support of her lay conclusion that these findings are consistent with a finding of radiculopathy.

physical therapy discharge notes shows that plaintiff terminated physical therapy "to babysit daughter's child" and not for the reason plaintiff stated at the hearing. (Tr. 421). This discrepancy undermines plaintiff's credibility and the ALJ appropriately considered the inconsistency between plaintiff's testimony and the physical therapy notes in assessing plaintiff's credibility. (Tr. 22). *See* 20 C.F.R. § 404.1529(c)(4).

Third, plaintiff alleges there was a reasonable explanation for her refusal to take narcotic pain medications. She testified that she watched a friend of hers die after using those medications and was concerned about using medications that have the potential to cause addiction. (Doc. 10, citing Tr. 59-60). Despite plaintiff's explanation, the ALJ properly considered the fact that plaintiff did not take any narcotic pain medication for her allegedly disabling symptoms in assessing her credibility. *See* 20 C.F.R. § 404.1529(c)(3)(iv) (permitting ALJ to consider the type of medication that a claimant takes for her alleged symptoms). *See also Nagle v. Comm'r of Soc. Sec.*, No. 98-3984, 1999 WL 777355, *2 (6th Cir. Sept. 21, 1999) (credibility finding upheld where the plaintiff stated he did not take medication as prescribed because he did not want to become dependent upon drugs and statement was inconsistent with his professed pain levels, household activities, and relief through medication).

Fourth, plaintiff contends the ALJ erred in relying on plaintiff's unsteady work history and "babysitting activity" to find she is capable of competitive employment. The ALJ stated that plaintiff's employment history was not long and steady and, therefore, the ALJ could not assume plaintiff would be working if she could despite her testimony that she wanted to work. (Tr. 22). The ALJ also determined that plaintiff's ongoing babysitting of her grandchildren, who are five,

six, and 18 months old, is inconsistent with her claim that she is too sick and disabled to work. (Tr. 23).

Plaintiff argues the ALJ's reliance on her work history is inappropriate as her limited work history can be explained by the fact that she stayed home for a period of time to raise her children. (Doc. 10 at 19). Plaintiff also contends that her limited babysitting activity is not evidence that she could sustain full-time competitive work. Plaintiff testified that she watches the children from 11:00 a.m. to 7:00 p.m., the two eldest grandchildren are at school for most of the day, and she keeps the baby in an enclosed area as she is unable to run after the child. (Tr. 49, 57). She also testified that her husband and son help with babysitting, and she takes frequent rest breaks because of the pain caused by watching the children. *Id.*

The ALJ properly considered plaintiff's work history and babysitting activity in assessing her credibility. SSA regulations provide that the fact-finder "will consider all of the evidence presented, including information about your prior work record." 20 C.F.R. § 404.1529(c)(3). *See also* SSR 96-7p (ALJ should consider "prior work record" is making credibility determination). Although plaintiff provided an explanation for her sporadic work history for a period of time, the ALJ could reasonably conclude from the evidence of plaintiff's work history that she was not motivated to work even if physically able. *See Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (upholding the ALJ's credibility determination based in part on finding that sporadic work history indicated claimant "was not strongly motivated to engage in meaningful productive activity"). In addition, plaintiff downplays the amount of effort and activity she expends in watching her grandchildren. The ALJ considered this explanation (Tr. 22), but reasonably concluded that providing essentially full-time care for small children, including an 18

month old child, was inconsistent with plaintiff's claims of disabling pain and limitations.

In addition to the factors discussed above, the ALJ also observed plaintiff during her hearing, assessed the consistency of her allegations with the medical evidence, considered plaintiff's activities of daily living and her ability to care for herself, addressed her treatment history and medication, and reached a reasoned decision that plaintiff's allegations of disabling pain and limitations were not fully credible. "Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-390 (6th Cir. 1999). Because the ALJ's credibility finding is supported by substantial evidence, plaintiff's third assignment of error should be overruled.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: 9/5/2012

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

CARMEN CHAMBERS,  
      Plaintiff,

      vs

COMMISSIONER OF  
SOCIAL SECURITY,  
      Defendant.

Case No. 1:11-cv-453  
Barrett, J  
Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).